UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 24 CR 566-4 |
| v. | |
| MARQUISE RAMYYEH | Judge Rebecca R. Pallmeyer |

**GOVERNMENT'S SENTENCING MEMORANDUM**

On the morning of December 6, 2023, defendant Marquise Ramyyeh and his three co-defendants brazenly robbed three electrical workers installing natural gas pipeline at gunpoint. The robbery occurred in broad daylight near the intersection of 97th Street and Dr. Martin Luther King Drive. Two of the victims were actively working with heavy machinery—and the third victim was retrieving tools from his work van—when Ramyyeh jumped out of a stolen Jeep Cherokee and pointed a gun directly in their faces. J. Green and Birden also brandished firearms at the victims. Ramyyeh and Birden dragged a RIDGID camera and a Digitrak locator box, with a combined total value of approximately $25,000, into the Jeep and fled.

The gravity of Ramyyeh's actions, as well as the need to protect the public and deter Ramyyeh and others from similar conduct, warrant a significant sentence. Despite his youth, Ramyyeh's criminal history reflects a pattern of significant thefts. Indeed, Ramyyeh was on state supervised release when he committed the instant offense for the theft of an Ulta Beauty store, and he has a pending case in the Circuit Court of Cook County for a $210,000 theft of a Luis Vuitton store. These were both high-value thefts, and Ramyyeh was convicted of possessing a firearm in connection

with the Ulta Beauty store theft. It is apparent from Ramyyeh's criminal history that he has thus far been undeterred from engaging in risky thefts of high-value targets, including while in possession of firearms. The government therefore requests that the Court sentence defendant to 130 months' imprisonment. A 130-month sentence will provide justice for defendant's victims and is sufficient but not greater than necessary to satisfy the goals set forth in the Sentencing Guidelines and 18 U.S.C. § 3553(a).

I.  **PROCEDURAL HISTORY**

On December 9, 2024, a federal grand jury returned an indictment charging Ramyyeh with conspiracy to commit robbery, in violation of Title 18, United States Code, Section 1951(a)(1) (Count One); robbery, in violation of Title 18, United States Code, Section 1951(a)(1) (Count Two); one count of brandishing a firearm in relation to that robbery, in violation of Title 18, United States Code, Section 924(c)(1)(A) (Count Three); and one count of felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1) (Count Four). Dkt. 1. Three other codefendants were charged in the same indictment. On August 22, 2025, Ramyyeh pled guilty to Counts Two and Three of the indictment. Dkt. 128-129.

II.  **GUIDELINES CALCULATIONS**

The government has no objections to the PSR prepared by the United States Probation Office ("Probation") and agrees with the offense level, criminal history, and advisory Guidelines calculations therein. Specifically, the government agrees with Probation that the total offense level is 20. PSR ¶ 41. The government also agrees with the criminal history calculations set forth in the PSR (PSR ¶ 51), and asserts

that defendant has three criminal history points, and his criminal history category is II.

With a total offense level of 20 and a criminal history category of II, the advisory sentencing guidelines range is 37 to 46 months' imprisonment on Count Two, in addition to any supervised release, fine, and restitution the Court may impose. PSR ¶ 110. Defendant is also subject to a mandatory minimum sentence of 84 months on Count Three, which must be served consecutively to the sentence imposed on Count Two. *Id*. ¶ 111.

### A. Defendant's Objections to the Guidelines Calculation

Defendant objects to a one-level enhancement for loss exceeding $20,000, pursuant to Guideline § 2B3.1(b)(7)(B), arguing that the value of the electrical equipment that he stole was less than $20,000. Dkt. 153. Defendant's argument is unavailing. First, defendant admitted in the factual basis of his plea agreement that the value of the equipment that he stole was approximately $25,000. See Dkt. 129, ¶6 ("Defendant acknowledges that the combined total value of the stolen equipment is approximately $25,000."). Now, however, he argues that "[t]he used equipment taken in this case can be purchased on 'eBay' for less than $15,000." Dkt. 153 at 2. This position is inconsistent with the factual basis of his plea agreement.

Further, for purposes of Guideline § 2B3.1, "'loss' means the value of the property taken, damaged, or destroyed." Guideline § 2B3.1, App. n. 3. "Value" here should be determined by the replacement cost to Company A, not by the resale value on eBay, as Ramyyeh erroneously contends. Had the equipment not been recovered

3

by police, Company A would have obtained replacement equipment from a reputable seller that offered warranties of quality, not from eBay. While the receipts for the precise equipment stolen could not be located, Company A provided the FBI with sales estimates reflecting the cost to the company of purchasing replacement equipment, attached as Exhibit A. The sales estimate for the same model of Ridgid camera and monitor that was stolen by Ramyyeh is $13,041.56. The estimate for the Ridgid camera is dated May 3, 2023, approximately 8 months before the robbery. Company A also provided a sales estimate for the same model F5 Digitrax locator box stolen by defendant, dated February 8, 2024, approximately two months after the robbery occurred. The sales estimate for the Digitrax locator box includes parts that were not stolen by Ramyyeh, namely, a transmitter and touch screen display. Because Company A orders the Digitrax locator box as a complete system, an estimate for solely the locator box is not available. The total estimate for all three components—locator box, touch screen display, and monitor—totaled $30,240.00. Even though the Digitrax estimate includes components not stolen, the estimates for the Ridgid camera and the Digitrax locator taken together support Company A's approximate estimate of $25,000.

  Defendant further objects to a three-level enhancement for reckless endangerment, pursuant to Guideline § 3C1.2, arguing that he did not create a substantial risk of death or serious bodily harm when he tossed a loaded Glock pistol into a residential backyard as he was fleeing from police. Defendant now argues that "[n]o police officers were chasing him when he tossed a gun into a vacant yard." Dkt.

4

153 at 1. That is incorrect. As set forth in defendant's plea agreement and the Government's Version of the Offense, defendant and his three co-defendants fled from the Jeep containing the stolen equipment when the police arrived. The police were stationed in the alley behind the backyard where the Jeep was parked, as well as in front of the residence where the Jeep was parked, and they immediately began to give chase. At approximately the same time, Officer Jaida Sherod observed a black object fly through the air into the adjacent backyard—the loaded Glock pistol thrown by Ramyyeh as he ran. Thus, Ramyyeh's action of tossing a loaded pistol jeopardized the safety of law enforcement stationed in the immediate vicinity, as well as the safety of any potential occupants of the backyard where the pistol landed.

The Seventh Circuit upheld the application of the reckless endangerment enhancement where defendant "toss[ed] a loaded gun into the backyard of a resident." *United States v. Taylor*, 160 F.4th 874, 886 (7th Cir. 2025). The Taylor court rejected defendant's argument—similar to one pressed by Ramyyeh here—that his gun toss posed little risk because "he tossed the gun in an isolated part of a backyard" and the pistol's safety system was designed to prevent accidental discharges. *Id.* The Seventh Circuit affirmed the district court's ruling applying the enhancement pursuant to Guideline § 3C1.2, noting that there could have been people in the backyard when the gun was tossed into it and that there was no basis to infer that the defendant knew anything about the pistol's safety system. The same reasoning applies here and supports the application of the enhancement.

5

### III. THE SECTION 3553(a) FACTORS SUPPORT A SENTENCE OF 130 MONTHS' IMPRISONMENT

The Sentencing Guidelines provide a starting point and initial benchmark for sentencing. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). Here, the Guidelines range is high. But it is high for a reason. It is high because defendant stole valuable equipment. It is high because defendant committed an extremely violent and dangerous crime that put several innocent lives in peril, and then caused numerous police officers to go on a manhunt looking for him. In short, the Guidelines range is high, but a sentence of 130 months is appropriate given defendant's complete disregard for human life, his escalating criminal behavior, the need to protect the public, and the need to deter defendant and others from committing similar offenses.

#### A. The Nature and Circumstances of the Offense Justify a Significant Sentence

The seriousness of defendant's offense cannot be overstated and alone warrants a significant period of incarceration. Along with his co-conspirators, defendant robbed three electrical workers at gunpoint. "A robber with a loaded gun . . . places lives at risk because of the prosect that, should the need or impulse arise, he will commit murder." *United States v. Ray*, 21 F.3d 1134, 1141 (D.C. Cir. 1994). By brandishing a firearm, a robber "has empowered himself to turn the scene violent at will." *Id*. "His threat not only magnifies the chances that he will do just that if anyone gets in his way but also increases the likelihood of a violent response." *Id*. As the Seventh Circuit noted, offenses involving guns are categorically more dangerous than others: "Once the gun is in the defendant's hands he need only pull the trigger, an act which can be completed in a split second and which is controlled and influenced

6

by nothing more than the defendant's whim." *United States v. Mathews*, 520 F.3d 806, 809 (7th Cir. 2008) (quoting *United States v. Lane*, 267 F.3d 715, 718 (7th Cir. 2001)).

Here, defendant's armed robbery epitomizes the risk described by the Seventh Circuit. It was a high-stakes, high-reward robbery, and defendant willingly risked getting into a deadly shootout for the possible windfall of approximately $25,000. Defendant's crime was brazen and violent. Motivated only by his own greed, defendant showed a complete disregard for human life. A significant sentence is necessary to ensure that defendant never again commits a violent crime and puts innocent lives at risk. When considering only defendant's extreme conduct in this case, a sentence within the advisory Guidelines range would be easily justifiable.

**B. A Significant Sentence is Necessary to Afford Adequate General Deterrence**

"Sentencing judges must consider, among other things, the need for a sentence 'to afford adequate deterrence to criminal conduct.'" *United States v. Arroyo*, 75 F.4th 705, 708 (7th Cir. 2023), quoting 18 U.S.C. § 3553(a)(2)(B). "The idea of general deterrence, put simply, is that the longer the sentence, the more it will discourage similar criminal conduct by others." *Id*.

A significant sentence is warranted here to afford adequate deterrence for the public. Defendant's robbery was part of a series of high-value thefts—often occurring in the daytime and in busy, public stores—that defendant has engaged in since he was only 16 years old. It is important to send a message to the community that although valuable equipment and merchandise hold the allure of being highly lucrative targets for theft, they carry stiff consequences that outweigh any prospect

7

of personal gain. "General deterrence is, after all, an economic theory of punishment: 'Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence." *Arroyo*, 75 F.4th at 708, quoting *United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008). Unlike an impulsive shooting resulting from an argument, armed robberies are pre-planned and lucrative—in less than a minute, defendant and his co-conspirators stole over $25,000 worth of equipment— and a significant sentence will deter future potential robbers who may believe the risks of such a robbery are worth the potential reward.

### C. A 130-Month Sentence Will Address Defendant's History and Characteristics While Providing Just Punishment, Affording Adequate Specific Deterrence, and Protecting the Public

Defendant's history and individual characteristics offer both aggravation and mitigation. Defendant was on state supervised release for aggravated unlawful use of a weapon in connection with a high-value retail theft when he committed the instant offense. PSR ¶¶ 48, 50. According to the PSR, Ramyyeh was the getaway driver for a retail theft of an Ulta Beauty store in which the offenders stole 51 fragrance bottles, valued at $6,368, and fled in a vehicle. *Id*. Similar to the instant offense, when police tracked down the offenders, Ramyyeh fled on foot and threw a loaded Glock pistol into a residential backyard. *Id*. Ramyyeh was sentenced to 18 months' imprisonment; he was released on September 22, 2023, just three months before he committed the instant robbery.

Even before Ramyyeh robbed Company A's workers at gunpoint on December 6, 2023, he and others stole purses valued at $210,000 from a Luis Vuitton store on

8

Michigan Avenue on November 13, 2023. PSR ¶53. In just a few short months after being released from custody, therefore, Ramyyeh was involved in two significant thefts or robberies—the Luis Vuitton theft and the current robbery of Company A's employees. It is extremely concerning that at just 21 years old, defendant's criminal history escalated rapidly from theft to armed robbery of electrical workers in broad daylight.

Defendant's history does offer some mitigation. He was young when he committed this crime, and until the age of 16, he largely avoided criminal conduct. PSR ¶ 55. He also had a difficult childhood. His father was not present in his life, and his stepfather was killed in an incident of gun violence when Ramyyeh was only eleven years old. PSR ¶ 62. Ramyyeh grew up in violent neighborhoods without financial stability. PSR ¶ 66. Troublingly, he was also directly exposed to the danger of guns at a young age. In 2021, he was shot in the right calf. PSR ¶79. This traumatic incident, as well as defendant's difficult childhood, certainly factored into defendant's choice to commit dangerous, violent crimes. But, as Probation noted, defendant "has been the victim of gun violence, and has known other victims of gun violence, and it is unconscionable to this officer how somebody who has been traumatized by gun violence could place others in fear of being similarly victimized." Prob. Rec. Ltr. at 3.

Ultimately, defendant's youth and relatively limited criminal history does offer some mitigation and a potential for turning his life around. But it does not warrant the 121-month sentence proposed by Probation. Defendant's escalating criminal history raises a significant concern that defendant will recidivate upon his release.

9

Defendant was just 19 years old when he committed the instant offense and will be 21 years old at the time of his sentencing. According to the United States Sentencing Commission's report *Youthful Offenders in the Federal System*, youthful offenders have the highest recidivism rate of all federal offenders, with defendants sentenced between ages 21 and 25 having a 65.6% recidivism rate.[1] Because of the significant risk that defendant will return to criminal activity upon his release at a relatively young age and the need to ensure he ages out of his dangerous criminal conduct, a sentence of 130 months is needed in order to adequately deter defendant.

**SUPERVISED RELEASE**

The government agrees with Probation's recommendation that the Court impose a period of supervised release of three years. The government agrees with the supervised release conditions set forth in the PSR, which are narrowly tailored to facilitate supervision by the probation officer, deter the defendant from future crimes, support defendant's rehabilitation and reintegration into the community, and ensure that he is engaged in lawful pursuits rather than criminal activity. Given defendant's history and characteristics, his offense conduct, and the purposes of sentencing set forth in 18 U.S.C. §§ 3553 and 3583, the government joins Probation in requesting that the defendant be required to comply with the conditions of supervised release set forth in the PSR.

---

[1] United States Sentencing Commission, *Youthful Offenders in the Federal System* (May 25, 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170525_youthful-offenders.pdf, at 49 (last accessed April 18, 2025).

10

## IV. RESTITUTION

Pursuant to 18 U.S.C. § 3663A, restitution is mandatory in this case. In his plea agreement, defendant agreed to pay restitution in an amount determined by the Court at sentencing. However, because Company A's stolen equipment was recovered by the police and returned to Company A, the government is not requesting restitution in this case.

## V. CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence defendant to 130 months' imprisonment, to be followed by three years of supervised release. Such a sentence is sufficient, but not greater than necessary, to satisfy the 18 U.S.C. § 3553(a) sentencing factors.

    Respectfully submitted,

    ANDREW S. BOUTROS
    United States Attorney

By: */s/ Emily C.R. Vermylen*
    EMILY C.R. VERMYLEN
    Assistant United States Attorney
    219 South Dearborn Street, 5th Floor
    Chicago, Illinois 60604